UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA, STATE OF
FLORIDA, STATE OF ILLINOIS, STATE OF
INDIANA, STATE OF LOUISIANA, STATE
OF NEW YORK, STATE OF GEORGIA and
STATE OF HAWAII ex rel. SEAN J. HELLEIN,

       Plaintiffs,                  CASE NO.8:06-CV-01079-T-30TGW

          v.

WELLCARE HEALTH PLANS, INC.,
WELLCARE OF FLORIDA, INC.,
HARMONY BEHAVIORAL HEALTH,
INC., HEALTHEASE HEALTH PLANS
OF FLORIDA, INC., HEALTHEASE OF
FLORIDA, INC., AMERIGROUP
CORPORATION, AMERIGROUP
FLORIDA, INC., HUMANA MEDICAL
PLAN, INC., d/b/a HUMANA FAMILY,
VALUE OPTIONS, INC., FLORIDA HEALTH
PARTNERS, INC., FLORIDA BEHAVIORAL
HEALTH, INC., UNITED HEALTHCARE
OF FLORIDA, INC., UNITED HEALTH
GROUP, INC., UNITED HEALTHCARE
SERVICES, INC., d/b/a AMERICHOICE and
VISTA HEALTHPLAN, INC., d/b/a BUENA
VISTA, TODD FARHA, PAUL BEHRENS and
THADDEUS BEREDAY,

       Defendants.
_____/

## CORRECTED EIGHTH AMENDED FALSE CLAIMS ACT COMPLAINT
## AND DEMAND FOR JURY TRIAL

    1.     SEAN J. HELLEIN (hereinafter "Relator" or "HELLEIN") brings this

action on behalf of the United States of America, the State of Florida, the State of Illinois,

the State of Indiana, the State of Louisiana, the State of New York, the State of Georgia,

and the State of Hawaii, against WELLCARE HEALTH PLANS, INC., (hereinafter "WELLCARE"), WELLCARE OF FLORIDA INC., formerly known as WellCare HMO, Inc., (hereinafter "WELLCARE OF FLORIDA"), HEALTHEASE OF FLORIDA, INC., (hereinafter "HEALTHEASE"), HARMONY BEHAVIORAL HEALTH, INC., (hereinafter "HARMONY"), HEALTHEASE HEALTH PLANS OF FLORIDA, INC., AMERIGROUP CORPORATION and AMERIGROUP FLORIDA, INC., ( collectively "AMERIGROUP"), VALUEOPTIONS, INC. and FLORIDA HEALTH PARTNERS, INC, and FLORIDA BEHAVIORAL HEALTH, INC., (collectively "VALUEOPTIONS"), HUMANA MEDICAL PLAN, INC., d/b/a HUMANA FAMILY (hereinafter "HUMANA"), UNITED HEALTH GROUP, INC., and UNITED HEALTHCARE SERVICES, INC., d/b/a AMERICHOICE ("collectively "UNITED HEALTHCARE") and VISTA HEALTHPLAN, INC. d/b/a BUENA VISTA (hereinafter "VISTA") for treble damages and civil penalties for the Defendants' violations of the False Claims Act, 31 U.S.C. § 3729 et seq; the Florida False Claims Act, Florida Statutes 68.081 et seq; the Illinois Whistleblower Reward and Protection Act, Illinois Compiled Statutes Chapter 740, Act 175 et seq.; the Indiana False Claims and Whistleblower Protection Act; Indiana Code 5-11-5.5, et seq; the Louisiana Medical Assistance Programs Integrity Statute, Louisiana Revised Statutes § 437.13 et seq; the New York False Claims Act, New York State Finance Law § 187 et. seq; the Georgia False Medicaid Claims Act, Code of Georgia § 49-4-168; and the Hawaii False Claims Act, 36 Hawaii Revised Statutes 661-21 et seq.

2.     The False Claims Act, 31 U.S.C. §. 3729, et seq., provides that any person who knowingly submits or causes to be submitted a false or fraudulent claim to the

Government for payment or approval is liable for a civil penalty of up to $11,000 for each such claim submitted or paid, plus three times the amount of damages sustained by the Government. Liability attaches both when a defendant knowingly seeks payment that is unwarranted from the Government; and when false records or statements are knowingly created or caused to be used to conceal, avoid or decrease an obligation to pay or transmit money to the Government. The Act allows any person having information regarding a false or fraudulent claim against the Government to bring an action for himself (the "Relator") and for the Government and to share in any recovery by the Government. The Complaint is filed under seal for 60 days (without service on the defendants during that period) to enable the Government: (a) to conduct its own investigation without the defendants' knowledge; and (b) to determine whether to join the action.

3.      As required by the False Claims Act, 31 U.S.C. § 3730(b)(2), the Relator has provided to the Attorney General of the United States, to the United States Attorney for the Middle District of Florida, and to the Attorney Generals of Florida, Illinois, Indiana, Louisiana, New York, Georgia, and Hawaii, a statement of all material evidence and information related to the Complaint. This disclosure statement is supported by material evidence known to the Relator establishing the existence of Defendants' false claims. Because the disclosure statement includes attorney-client communication and work product of Relator's attorneys, and is submitted to the Attorney General, to the United States Attorney, and to the various state attorneys general in their capacity as potential co-counsel in the litigation, the Relator understands this disclosure to be confidential.

3

## Jurisdiction and Venue

4.        This action arises under the False Claims Act, 31 U.S.C.  § 3729 et seq. This Court has jurisdiction over this case pursuant to 28 U.S.C.  § 1345, 28 U.S.C.  § 1331, 31 U.S.C. § 3732 (a) and § 3730(b), and 28 U.S.C. § 1367.

5.        Venue is proper in this District pursuant to 31 U.S.C. § 3732(a), because the acts proscribed by 31 U.S.C. § 3729 et seq. and complained of herein took place in Hillsborough County within this District, and is also proper pursuant to 28 U.S.C. §§1391(b) and (c) because at all relevant times Defendants transacted business in this District.

## Parties

6.        Relator SEAN J. HELLEIN worked for Defendant WELLCARE as a Senior Financial Analyst.   He was employed by WELLCARE from November 2002 through October 2007.  Relator HELLEIN brings this action upon his direct, independent, and personal knowledge.

7.        Defendant WELLCARE is a Delaware corporation licensed to operate as a health maintenance organization with its principal place of business in Tampa, Florida. In addition to Florida, WELLCARE conducts business in New York, Connecticut, Illinois, Indiana, Louisiana, Georgia and Hawaii.  Medicaid programs administered by those states pay WELLCARE and the other named Defendants, who are related entities, monthly premium or capitation for managing the cost of providing medical services to Defendants' members, who are Medicaid beneficiaries.  Virtually one hundred (100) percent of WELLCARE's revenues are derived from the Government, and the above named states through Medicaid and Medicare contracts.

8.     Defendant HARMONY was the behavioral health department of Defendant WELLCARE until its incorporation in 2005.

9.     Defendants HEALTHEASE OF FLORIDA, INC., and HEALTHEASE HEALTH PLANS OF FLORIDA, INC., are wholly owned and operated by WELLCARE and provide similar health management services in Florida under Medicaid contracts.

10.     Defendant WELLCARE OF FLORIDA is wholly owned and operated by WELLCARE and was formerly known as WellCare HMO, Inc.

11.     Defendant AMERIGROUP is a Delaware corporation with its principal place of business in Virginia Beach, Virginia.   AMERIGROUP operates a health maintenance organization in Florida as Defendant AMERIGROUP FLORIDA, INC. Like WELLCARE, defendant AMERIGROUP derives substantially all of its revenues from the government and from state governments, through state programs for poor people.  In Florida, it is paid fixed premiums by Florida Medicaid and other, similar programs in exchange for managing the costs of medical services provided to poor persons.

12.     Defendant VALUEOPTIONS is a national managed care company based in Norfolk, Virginia that specializes in management of mental health and chemical dependency diagnoses.   VALUEOPTIONS delivers behavioral health services to Medicaid recipients in Florida through FLORIDA HEALTH PARTNERS, INC., which is owned by VALUEOPTIONS and FLORIDA BEHAVIORAL HEALTH INC., a group of local mental health and substance abuse providers.

13.     Some of the same persons have held senior executive positions in both defendant WELLCARE and defendants AMERIGROUP and VALUEOPTIONS.   For

example, M.T. Sattaur, formerly WELLCARE's President of Florida Operations, was formerly CEO of defendant AMERIGROUP.

14.     Although   defendants   WELLCARE,   AMERIGROUP   and VALUEOPTIONS compete for business in Florida and elsewhere, they also cooperate with each other by consciously making the same false claims against Florida Medicaid in order to reduce the likelihood that such false claims are detected because of discrepancies with respect to costs of the same services as reported to Medicaid by each company.

15.     Defendants HUMANA MEDICAL PLAN, INC., d/b/a HUMANA FAMILY, UNITED HEALTHCARE OF FLORIDA, INC., and its related entities UNITED HEALTHGROUP INC. and UNITED HEALTHCARE SERVICES., d/b/a AMERICHOICE, and VISTA HEALTHPLAN, INC., d/b/a BUENA VISTA operate HMOs for Florida Medicaid recipients.

16.     Defendant TODD FARHA was the Chief Executive Officer (CEO) of WELLCARE HEALTH PLANS, Inc. during all relevant times.

17.     Defendant PAUL BEHRENS was the Chief Financial Officer (CFO) of WELLCARE HEALTH PLANS, Inc. during all relevant times.

18.     Defendant THADDEUS BEREDAY was the Senior Vice President, Secretary and General Counsel of WELLCARE HEALTH PLANS, Inc. during all relevant times.

### General Allegations

19.     Medicaid is a cooperative federal-state welfare program that pays for providing medical assistance to needy people.  Although Medicaid is managed by participating states, in Florida more than fifty-five (55) percent of the cost of the Florida

Medicaid program is currently paid by the United States Government and approximately forty-five (45) percent is funded by the State of Florida. Medicaid programs in New York, Indiana, Illinois, Connecticut, Louisiana, Georgia and Hawaii are funded through similar cost sharing arrangements, although proportions of federal-state funding vary from state to state.

20.     Title 42 U.S.C. § 1320a-7b(a)(3) makes it a federal crime for anyone who has "knowledge of the occurrence of any event affecting . . . his initial or continued right" to any benefit or payment under a federal health care program to "conceal or fail to disclose such event with an intent fraudulently to secure such benefit or payment in a greater amount or quantity than is due. . ."

21.     The False Claims Act, 31 U.S.C. § 3729(a)(7), prohibits knowingly making, using, or causing to be made or used, "a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the Government."

22.     Health management or health maintenance organizations (HMOs) that contract with the Medicaid and Medicare programs and who discover material errors or omissions in claims or supporting documents that result in overpayments, or that erroneously decrease or avoid their obligation to pay or transmit money to the Government or to a state, are required to timely disclose those errors or omissions to Medicaid or Medicare. Contractors are not free silently to accept windfalls from such errors, much less to exploit them by continuing knowingly to avoid repayment obligations, and by taking steps to conceal errors or omissions.

23.     The Florida False Claims Act, Florida Statute § 68.082(2)(g), prohibits knowingly making, using, or causing to be made or used, "a false record or statement to

conceal, avoid or decrease an obligation to pay or transmit money or property to an agency."

24.     The Illinois Whistleblower Reward and Protection Act, Illinois Compiled Statutes, Chapter 740, Act 175/3, § 3(a)(7), prohibits knowingly making, using, or causing to be made or used, "a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the State."

25.     The Louisiana Medical Assistance Programs Integrity Law, Louisiana Revised Statutes § 438.3(C), provides that "[n]o person shall conspire to defraud, or attempt to defraud the medical assistance programs through misrepresentation. . ."

26.     The Indiana False Claims and Whistleblower Protection Act, Indiana Code 5-11-5.5(B)(6) prohibits knowingly or intentionally making or using "a false record or statement to avoid an obligation to pay or transmit property to the State."

27.     The New York State False Claims Act, Finance Law § 189(1)(g), prohibits knowingly making, using, or causing to be made or used, "a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the State or a local government."

28.     The Georgia False Medicaid Claims Act § 49-4.168.1(a)(7), prohibits knowingly making, using, or causing to be made or used, "a false record or statement to conceal, avoid, or decrease an obligation to pay, repay or transmit money or property to the State of Georgia."

29.     The Hawaii False Claims Act, 36 Hawaii Revised Statutes 661-21(f), prohibits knowingly making, using, or causing to be made or used, "a false record or

statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State."

### COUNT I:
### Reverse False Claims In Violation of 31 U.S.C. § 3729(a)(7), Florida Statute § 68.082(2)(g), and Illinois Compiled Statutes, Chapter 740, Act 175/3, § 3(a)(7)

30.    Relator realleges and incorporates by reference paragraphs 1 through 29.

31.    Defendant WELLCARE, as well as the AMERIGROUP and VALUE OPTIONS defendants, contracts with the Florida Medicaid program to manage the costs of providing outpatient behavioral health services, including Targeted Case Management and Community Mental Health services to Medicaid beneficiaries.

32.    Paragraph 60.3.6 of WELLCARE's contract with Florida Medicaid relating to Targeted Case Management and Community Mental Health services provides that "80 percent of the capitation paid to the plan shall be expended for the provision of behavioral health care services.  In the event the plan expends less than 80 percent of the capitation the difference shall be returned to the agency no later than May 1 of each year."  The foregoing provision mirrors language in Florida Statutes, § 409.912(3)(b), which also applies to AMERIGROUP's and VALUE OPTION's contracts with Florida Medicaid for Targeted Case Management and Community Mental Health Services. WELLCARE's contract with the Illinois Medicaid program contained a similar refund obligation and/or an off-setting deduction from future premium payment.

33.    Prior to entering into the contract described above, Defendant WELLCARE and Florida Medicaid had entered into a comprehensive cost management agreement covering a range of in-patient, out-patient, emergency room, and pharmacy

services, and specifically also including behavioral health services rendered for patients in hospitals, nursing homes, and similar in-patient settings.

34.     Defendant WELLCARE's pre-existing contract differed significantly from the contract for Targeted Case Management and Community Mental Health services in that the pre-existing contract did not contain an obligation to repay Medicaid in the event capitation expended for services was lower than a targeted percentage.

35.     Although Paragraph 60.3.6, above, refers to "behavioral health care services," the parties well understood that its coverage was necessarily limited to Targeted Case Management and Community Mental Health services because in-patient, out-patient, emergency room, and pharmacy services were already covered under WELLCARE's pre-existing comprehensive Medicaid contract.

36.     As early as 2002, and continuing thereafter at least until the date of this Amended Complaint, Defendant WELLCARE knowingly and intentionally shifted and misallocated costs pertaining to the pre-existing Medicaid contract, by fraudulently and wrongfully categorizing expenses covered under the pre-existing contract as expenses covered under the Targeted Case Management and Community Mental Health services contract in order to reduce and avoid its premium repayment obligations.

36.     In or about June 2004, WellCare repaid Florida Medicaid approximately $6 million in Targeted Case Management and Community Mental Health services premium pertaining to years 2002 - 2003. Financial Analyst Greg West told Relator that "Todd [Farha] was frustrated that the Health Services team lacked the foresight to offset the 2002-2003 payback." CEO TODD FARHA then directed Dr. Bill Kale, then head of WellCare's behavioral health department, to come up with a plan under which WellCare

could significantly reduce or avoid future Medicaid repayment obligations for Targeted Case Management and Community Mental Health services.

37.     Pursuant to CEO TODD FARHA's directive, Dr. Kale instructed Mr. West to include specified non-related services as costs to be associated with the behavioral health program. Although these costs were unrelated to WellCare's Targeted Case Management and Community Mental Health services, by falsely reporting them as program expenses, WellCare was able to retain significantly more Medicaid premium than its legitimate 20% profit.  TODD FARHA reviewed and approved Dr. Kale's and Mr. West's false cost add-ons.  As a result of these fraudulently allocated costs, WellCare reduced its payback to the Florida Medicaid program for the years 2003 thru 2005 and caused losses to the Florida Medicaid program of approximately $23 million.

38.     As shown in **Exhibit 1** in 2005, WellCare received a total premium of $30 million from Florida Medicaid in order to provide Targeted Case Management and Community Mental Health services.  According to its contract with Medicaid, "in the event that WellCare expends less than 80% of the premium [$24 million] the difference shall be returned" to Medicaid.  WellCare's actual total medical costs as illustrated in **Exhibit 1** were $15 million.  Therefore, WellCare owed Florida Medicaid between $9-12 million.  Yet according to **Exhibit 1**, WellCare was presently considering the option of making an improper refund of only approximately $700,000.

39.     **Exhibit 2** is an e-mail from Greg West to Dr. Bill Kale and Director of Medical Economics Benjamin Orris, dated March 28, 2006.  It describes a "rough draft of the AHCA payback for CY 2005; outpatient behavioral health for Medicaid."  In this e-mail, Mr. West offered three possible payback options for 2005.  Under Option 1,

WellCare would pay back "$0" to Medicaid, assuming WellCare employed the capitation scheme involving Harmony Behavioral Health, Inc. described below. Option 2 resulted in a payback of $11.9 million. West said this amount assumed WellCare would not wrongfully include the $4.91 per member/per month inpatient charges "we did last year." (Inpatient expense is not a legitimate Targeted Case Management and Community Mental Health expense.) West's payback Option 3 offered a $9.2 million improper compromise based on a wrongful calculation utilizing non-related expenses for 2005.

40.     In April 2006, Defendant WELLCARE was erroneously informed by AHCA that Florida Medicaid had paid WELLCARE a total premium of $24,878,587 for outpatient behavioral health services. WELLCARE, however, knew that the true premium amount paid by AHCA was $30,310,183.

41.     Although WELLCARE knew of this $5.4 million overpayment, WELLCARE knowingly made and used false records to conceal, avoid and decrease WELLCARE's obligation to pay or transmit money to the Florida Medicaid Program.

42.     In June 2006, Vice President of Medical Economics Peter Clay told Financial Analyst Greg West that WELLCARE needed to maintain the same reporting method used to hide $10 million in the prior year.

43.     Around June 16, 2006, CEO TODD FARHA decided to refund $1.4 million of the over $10 million due to AHCA.

44.     Around April 6, 2007, WellCare fraudulently sent a payback check to the State of Florida for approximately $1.1 million. Financial Analyst Greg West had previously calculated that the correct payback should have been approximately $14.4 million for 2006. Greg West had provided that analysis to CFO PAUL BEHRENS and

Actuarial Director Jian Yu.  After receiving Greg West's analysis, Jian Yu came up with a fraudulent payback calculation methodology that reduced WellCare's 2006 payback obligation to approximately $1.1 million.

45.     Documents found by Relator in the MedEcon/Actuarial network printer in June 2006 show that WellCare had calculated its payback "exposure" under its Florida Healthy Kids contract at $3,793,429 for the October 2004 – September 2005 period.

46.     Defendant WELLCARE also knowingly and intentionally shifted and misallocated costs against its Illinois Medicaid contract in a similar manner.

47.     On October 31, 2006, Director of Corporate Development Dave Firdaus asked "Why do we have so many different efforts going on to inflate costs in Illinois, why don't we just create a shell company like we do in New York and the other states to avoid paying back the State?"

48.     Documents found by Relator in the MedEcon/Actuarial network provider in June 2006 show that WELLCARE calculated its payback "exposure" under its Illinois Medicaid Contract for the April 2005-March 2006 period as $2,704,486.

49.     By misallocating costs pertaining to the pre-existing Medicaid contract, and capitalizing on AHCA's error concerning actual premium amounts paid, WELLCARE, TODD FARHA and PAUL BEHRENS concealed, decreased and avoided its contractual and statutory obligation to repay and transmit money to the Government, and to the States of Florida and Illinois, through the Florida Medicaid Program and the Illinois Medicaid Program.

50.     Due to the actions of Defendants WELLCARE, FARHA and BEHRENS, the United States, the State of Florida and the State of Illinois suffered damages and

therefore are entitled to multiple damages under the Federal False Claims Act, the Florida False Claims Act, and the Illinois Whistleblower Reward and Protection Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

51.     Based on the conduct of WELLCARE, FARHA and BEHRENS in Florida and Illinois, Relator believes that WELLCARE shifted and misallocated costs, entered improper capitation arrangements and concealed premium overpayments on a company-wide basis to avoid or minimize payback of refund obligations in other states.

**COUNT II:**
**Reverse False Claims and False Claims Conspiracy in Violation of 31 U.S.C. §**
**3729(a)(3) and (a)(7) and Florida Statute § 68.082(2)(c) and (2)(g)**

52.     Relator realleges and incorporates by reference paragraphs 1 through 29.

53.     Florida Medicaid funds the Florida Healthy Kids Corporation ("Healthy Kids" or "FHKC") which has been empowered by the Florida Legislature pursuant to § 624.91(4)(b)(12), Florida Statutes, to enter into contracts with health maintenance organizations to provide comprehensive health insurance coverage, principally to poor children who do not qualify under other state Medicaid programs.

54.     On or about October 1, 2003, Healthy Kids entered into a medical services contract with Defendant WELLCARE and its wholly owned subsidiaries, HEALTHEASE and WELLCARE OF FLORIDA.  This contract provided for Healthy Kids to utilize HEALTHEASE's provider network to deliver comprehensive health care services to all eligible children in Citrus, Duval, Escambia, Highlands, Martin, Putnam and Wakulla Counties; the provider network of Defendant WELLCARE OF FLORIDA was to be utilized for Broward, Miami-Dade, Hernando, Hillsborough, Lee, Orange,

Osceola, Palm Beach, Pinellas and Seminole Counties. This medical services contract has been renewed and remained in effect as of the original filing date of this Complaint.

55.     Paragraph III of the October 2003 Medical Services Contract, attached as **Exhibit 3**, provides as follows:

> "In the event that the actual experience is less than 85 percent, in the aggregate for both Well Care and HealthEase, HEALTH PLAN shall pay to FHKC one-half of the difference.
>
> HEALTH PLAN shall annually provide FHKC with an aggregate experience report no later than March 1st for the prior calendar year. If any payments are due under this provision, HEALTH PLAN shall forward such payment with its written notification. HEALTH PLAN may be subject to audit or verification by FHKC or its designated agents.
>
> FHKC is not under any further obligation if the actual loss ratio exceeds 85%
>
> HEALTH PLANS effective dates: October 1, 2003 - September 30, 2005."

56.     Upon information and belief, beginning in or about the first quarter of 2004 and continuing thereafter until the date of this Complaint, Defendants WELLCARE OF FLORIDA and HEALTHEASE knowingly and intentionally conspired to shift and misallocate and shifted and misallocated costs incurred under other Medicaid contracts, fraudulently charging such expenditures to their medical services contract with Healthy Kids, and thereby concealed, avoided and decreased WELLCARE OF FLORIDA'S and HEALTHEASE'S contractual obligation to repay money to the Government and to the State of Florida.

57.     Documents found by Relator in the MedEcon/Actuarial network printer in June 2006 show that WELLCARE calculated its payback "exposure" under its Florida Healthy Kids contracts for the October 2004-September 2005 period as $3,793,429.

58.     Due to the actions of WELLCARE OF FLORIDA and HEALTHEASE, the United States and the State of Florida suffered damages and therefore are entitled to multiple damages under the Federal False Claims Act and the Florida False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

59.     Based on WELLCARE'S conduct in Florida and Illinois, Relator believes that WELLCARE shifted and misallocated costs and entered improper capitation arrangements on a company-wide basis to avoid or minimize payback of refund obligations in other states.

## COUNT III:
## Reverse False Claims and False Claims Conspiracy In Violation of 31 U.S.C. §§ 3729(a)(3) and (a)(7) and Florida Statute § 68.083(2)(c) and (2)(g)

60.     Relator realleges and incorporates by reference paragraphs 1 through 29.

61.     In and about 2005, Defendant WELLCARE caused the incorporation of Defendant HARMONY.  Prior to its incorporation, HARMONY was the behavioral health department of WELLCARE.

62.     Defendant WELLCARE's management team set up a new system of accounts whereby the costs of WELLCARE'S behavioral health services contract with Florida Medicaid would be captitated to HARMONY at the rate of eighty-five (85) percent, regardless of how much money was actually expended for behavioral health care services.

63.     By conspiring to set up a system of false cost accounting, Defendants WELLCARE and HARMONY intended to conceal, decrease, and avoid WELLCARE'S contractual and statutory obligation to pay money to the Government and to the State of Florida because WELLCARE'S Targeted Case Management and Community Mental Health services costs would be reported falsely as exceeding eighty (80) percent.

64.     In furtherance of the above conspiracy, on or about March 28, 2006, members of WELLCARE'S management team directed Financial Analyst Greg West to prepare a document showing a repayment obligation of zero dollars if WELLCARE arbitrarily capitated all behavioral health costs to HARMONY at eighty-five (85) percent **Exhibit 4**.

65.     In April or early May 2006, CFO PAUL BEHRENS asked Internal Audit Manager Christopher Price to stay clear of auditing HARMONY.

66.     On June 29, 2006, Financial Analyst Greg West calculated that WellCare's true payback obligation of $9,219,561 would be reduced to $1,440,449 due to the arbitrary capitation to HARMONY. **Exhibit 5**.

67.     In March 2007, Senior Director of Medical Economics Jian Yu told Relator and Senior Director of Harmony Behavioral Health Kerri Fritsch, "Each year we come up with a different method for avoiding payback, I'm going to create a standard method that we're going to use going forward to submit the pay back."

68.     Due to the actions of Defendants WELLCARE and HARMONY, the United States and the State of Florida suffered damages and therefore are entitled to multiple damages under the Federal False Claims Act and the Florida False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

69.    Based on WELLCARE'S conduct in Florida and Illinois, Relator believes that WELLCARE shifted and misallocated costs and entered improper capitation arrangements on a company-wide basis to avoid or minimize payback of refund obligations in other states.

**COUNT IV:**
**Reverse False Claims and False Claims Conspiracy in Violation**
**of 31 U.S.C. § 3729(a)(3) and (a)(7) and Florida Statute §§ 68.082(2)(c) and (2)(g)**
**and Illinois Compiled Statutes Chapter 740, Art. 175 § 3(a)(3) and 3(a)(7) and New**
**York State False Claims Act, Finance Law § 189(1)(c) and (1)(g)**

70.    Relator realleges and incorporates by reference paragraphs 1 through 29.

71.    Defendant WELLCARE markets a variety of health care cost management products funded by the Government and the State of Florida through capitation paid by Florida Medicaid.   WELLCARE'S profit is generally determined by the difference between the capitation it receives from Medicaid and Medicare and the amounts providers charge WELLCARE for rendering medical services to its members.

72.    As described in Count II, WELLCARE'S Healthy Kids contract contains a monetary repayment obligation to Florida Medicaid, the amount of which decreases as costs increase.

73.    Beginning in 2004 and continuing thereafter until the date of this Amended Complaint, Defendants WELLCARE and FARHA conspired and continues to conspire with hospitals and physicians in Florida, New York, Connecticut and other states to fraudulently manipulate the terms and conditions of contracts for multiple WELLCARE products to increase costs to Healthy Kids, while lowering expenses for other products that have no repayment obligations, and to prepay providers for medical

expenses in future years in order to inflate current year medical costs and thereby (1) avoid any payback or refund obligations, and (2) justify premium increases.

74.     As a result of these agreements, WELLCARE fraudulently over reports its Healthy Kids costs and thereby conceals, reduces, and avoids its contractual obligation to pay money to the Government and to the State of Florida through Florida Medicaid.

75.     In late November or early December 2005, Defendant WELLCARE negotiated a number of contracts, including contracts for the Healthy Kids program, with South Broward Hospital District ("South Broward"), which operates a number of hospitals in Broward County, Florida.

76.     In or about late November or early December 2005, WELLCARE and South Broward conspired to facilitate the concealment, reduction, and avoidance by WELLCARE of its obligation to pay money to the Government and the State of Florida by fraudulently increasing WELLCARE'S costs for Healthy Kids Medicaid beneficiaries by 31.6 percent and reducing costs for other contracts that did not contain a repayment obligation.

77.     In a December 7, 2005 email, WELLCARE CEO TODD FARHA admitted that WELLCARE'S contract with South Broward "was designed to push us up to the 80% give-back point with the state."

78.     The above-described contracts between Defendant WELLCARE and South Broward are an example of a fraudulent practice that has occurred in other instances where WELLCARE negotiated with a single provider to sell a number of different products, including Healthy Kids.

79.     On or about December 7, 2005, in furtherance of the above unlawful agreement, Peter Clay, WellCare's Vice President of Medical Economics, advised the Relator that he should not discuss high costs in the Healthy Kids contracts signed with South Broward because this was a "politically sensitive" topic and "part of our business strategy."

80.     On or about September 22 or 27, 2006, Relator met with Director of Florida Finance David Herndon and Florida Finance Business Analyst Jigar Desai. During this meeting, Herndon mentioned that there is a new push from "senior management" to pay money to hospitals this year in order to incur additional expenses offsetting future expenses.  Later that day, Florida Finance Director JoJo Young told Relator that TODD FARHA was pushing out a strategy in which WellCare would prepay for medical expenses through locking in expenses now in exchange for offsetting future expenses. **Exhibit 6.**  This tactic of costs swapping across years because WellCare was too profitable was also discussed on September 28, 2006 between Relator and Senior Medical Economics Consultant Kevin Manning concerning Connecticut, New York, and elsewhere. *Id.*

81.     Paying inflated amounts to hospitals and providers in the current year with the intention and agreement to re-capture these inflated payments in later years was a scheme that would strategically and unnecessarily inflate WellCare's current expenses in order to (1) make WellCare appear less profitable to regulators, (2) allow WellCare to retain already paid premiums (avoid refunds), and (3) help WellCare argue for increases in future premium rates.

82.     Relator knows that WELLCARE contracted with hospitals in Illinois to shift costs from the Medicare program to the Illinois Medicaid program in order to avoid a Medicaid refund obligation.

83.     Relator was informed that WELLCARE was contracting with Mount Sinai Hospital in Illinois to shift costs from Medicare to Medicaid in order to avoid a Medicaid refund obligation.

84.     Due to the actions of Defendants WELLCARE and FARHA, the United States, the State of Florida, the State of Illinois, the State of New York, the State of Connecticut, and other states suffered damages and therefore are entitled to multiple damages under the Federal False Claims Act, the Florida False Claims Act, the Illinois Whistleblower Reward and Protection Act and the New York State False Claims Act to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

85.     Based on WELLCARE'S conduct in Florida, Illinois, New York and Connecticut, Relator believes that WELLCARE shifted and misallocated costs, prepaid providers for medical expenses in future years, and entered improper capitation arrangements on a company-wide basis to avoid or minimize payback or refund obligations and justify premium increases in other states.

**COUNT V:**
**Knowingly Making or Using False Records to Get False or Fraudulent Claims Paid or Approved in Violation of 31 U.S.C. § 3729(a)(2); Florida Statute § 68.082(2)(b); Louisiana Revised Statutes § 438.3(B); Indiana Code 5-11-5.5-2(b)(2); Illinois Compiled Statutes Chapter 740, Art. 175, § 3(a)(2); New York City False Claims Act, § 7-803(2); New York State False Claims Act, Finance Law § 189(1)(b); Code of Georgia 49-4-168.1(a)(2); and 36 Hawaii Revised Statutes 661-21(f).**

86.     Relator realleges and incorporates by reference paragraphs 1 through 29.

87.     Pursuant to the Medicare Provider Reimbursement Manual, an HMO may undertake self-insurance arrangements through captive re-insurers, but premiums paid to such captive companies are not recognized as a reimbursable cost if they exceed the cost of comparable commercial reinsurance premiums.

88.     WELLCARE, on a company-wide basis, purchases reinsurance to cover unexpectedly large claims.  For claims arising out of New York's Medicare and Medicaid programs, including Child HealthPlus and Family HealthPlus, WELLCARE has traditionally utilized a private unrelated insurance company.

89.     In 2005, WELLCARE created a wholly-owned Cayman Islands reinsurance subsidiary.  WELLCARE pays reinsurance premiums to this subsidiary at a rate that is nearly five times higher than the rate it pays its unrelated re-insurers.  WELLCARE reportedly recaptures the inflated reinsurance premiums paid to its wholly-owned subsidiary by falsely characterizing such payments as derived from unrelated activities.

90.     In April 2006, Financial Analyst Greg West informed Relator that WELLCARE'S reinsurance costs in New York rose from approximately $0.60 per member per month to approximately $3.00 per member per month for nearly 100,000 WELLCARE members.

91.     On June 8, 2006, Greg West attended a meeting in which a change in the reinsurance rate in Connecticut from $0.80 per member per month to $3.83 per member per month was discussed.

92.     This manipulation allowed WELLCARE to knowingly under-report its profit margin in New York, Connecticut, and elsewhere, and to misrepresent its costs in

negotiations with New York Medicaid, Connecticut Medicaid, other Medicaid programs, and Medicare, and thereby persuade New York Medicaid, Connecticut Medicaid, other Medicaid programs, and Medicare to maintain WELLCARE's premiums at higher levels than justified by actual costs.

93.     In late April 2006, CEO TODD FARHA said he hoped "New York will not realize we are sending reinsurance dollars to our own subsidiary."

94.     Due to the false profit margin records made and used by Defendants WELLCARE and FARHA during WELLCARE's premium negotiations, the United States and the States of Florida, Louisiana, Indiana, Illinois, New York, and Georgia, and the City of New York suffered damages and therefore are entitled to multiple damages under the Federal False Claims Act, the Florida False Claims Act, the Illinois Whistleblower Reward and Protection Act, the Louisiana Medical Assistance Programs Integrity Law, the Indiana False Claims and Whistleblower Protection Act, the New York City False Claims Act, the New York State False Claims Act, the Georgia False Medicaid Claims Act, and the Hawaii False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

95.     Based on WELLCARE'S conduct described above, Relator believes that WELLCARE improperly manipulated reinsurance on a company-wide basis and in other states in order to avoid or minimize payback of contractual refund obligations and to justify premium increases.

### COUNT VI:
### Reverse False Claims In Violation of 31 U.S.C. § 3729(a)(7) and Florida Statute § 68.082(2)(g)

96.     Relator realleges and incorporates by reference paragraphs 1 through 29.

97.     Florida Medicaid pays WELLCARE premiums that vary by the ages of Medicaid beneficiaries, and also by Florida's AHCA regions.  For example, in AHCA Region 1, WELLCARE receives at least $4,800 a month for an SSI infant during months zero, one, and two of that infant's life.  For months three through eleven, however, the monthly SSI Medicaid premium is reduced to $1,500, since the cost of catastrophic birth injuries and defects is usually incurred in the first three months of life.

98.     During July 1, 2005 through September 2005, WELLCARE, AMERIGROUP, HUMANA, UNITED HEALTHCARE, and VISTA received erroneous overpayments for SSI and other Medicaid infant beneficiaries because of an error in birth cohort data.  More specifically, Medicaid mistakenly paid these defendants higher month zero, one, and two premium rates for members actually in the lower premium rate third through eleventh month age bands.  When overpayments began to be received, WellCare took note of the State's error.   Rather than immediately notify Medicaid, however, WellCare wrongfully retained the overpayment funds as an "accrual" in its accounting system in case Medicaid should detect the error.  This accrual exceeded $21 million dollars.  WellCare's knowing retention of overpayments for SSI is one example of a reverse false claim that occurs across Medicaid "rate cells" in other Florida AHCA regions.

99.     Based on AHCA statistics, WellCare had 54.6 percent of Florida Medicaid HMO members under the age of one in July-September 2005.  The following other HMOs had these percentages of the same population of members under one year of age in that time period: Amerigroup Florida had 17.8 percent; United Healthcare had 9.8 percent, Humana had 5.6 percent, and Buena Vista had 4.5 percent.   Since this

overpayment was made to multiple providers treating members under one year of age, since WellCare had 54.6 percent of this population and since WellCare had calculated its overpayment as $23.6 million, the estimated overpayments for the other providers based on their market share percentages are $7,684,602 for Amerigroup Florida; $4,253,420 for United Healthcare; $2,440,625 for Humana; and $1,940,717 for Vista d/b/a Buena Vista.

100.   In a staff meeting attended by Relator on May 4, 2006, Director of Medical Economics Ben Orris discussed with Relator an existing accrual on WellCare's financial books since July of 2005 evidencing these overpayments.   During their discussion, Relator made a remark to Ben Orris concerning the wrongfulness of retaining these funds and of related WellCare decisions.   Mr. Orris said WellCare made a series of unethical decisions, "particularly in the case of Dr. Kale's Behavioral Health payback."

101.   Medicaid has a premium rate structure based on age and sex of beneficiaries.   For months prior to July 2005, WellCare reports "actual" premium amounts received from the State of Florida.   However from July 2005 forward, WellCare reports a "calculated" premium that reveals what WellCare should have received from the State, but does not disclose the actual amount that WellCare received.   WellCare is specifically utilizing this change in reporting methodology in order conceal the State of Florida's $23.6 million dollar overpayment.   During an August 22, 2006 meeting, CFO Paul Behrens specifically stated "that [overpayment] is for the State to figure out and we [WellCare] will never report it on our financial statements."

102.   Although these defendants realized the extent of the above overpayments which, as of the date of this Complaint total approximately $23.6 million to WELLCARE alone, they have intentionally declined to notify Florida Medicaid of the erroneous

overpayments and have instead wrongfully retained the overpayments in violation of their contractual obligation to return overpayments to Florida Medicaid.

103.   Due to the actions of Defendants WELLCARE, AMERIGROUP, HUMANA, UNITED HEALTHCARE, and VISTA, the United States and the State of Florida suffered damages and therefore are entitled to multiple damages under the Federal False Claims Act and the Florida False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

104.   Based on WELLCARE'S conduct, Relator believes that WELLCARE concealed overpayments made due to data errors on a company-wide basis.

### COUNT VII:
### Knowingly Making or Using False Records to Get False or Fraudulent Claims Paid or Approved in Violation of 31 U.S.C. § 3729(a)(2), Florida Statute § 68.082(2)(b); and Indiana Code 5-11-5.5-2(b)(2)

105.   Relator realleges and incorporates by reference paragraphs 1 through 29.

106.   Defendant WELLCARE markets a variety of health care management products funded by the United States and various states through capitations paid by various state Medicaid programs.  WELLCARE'S profit on its Medicaid products is generally determined by the difference between the capitation it receives from these Medicaid programs and the amounts providers charge WELLCARE for rendering medical services to its members.

107.   Beginning in 2005 and continuing thereafter until the date of this Amended Complaint, Defendant WELLCARE fraudulently inflated and over-reported corporate completion factors to the Florida and Indiana Medicaid programs, including but not limited to IBNR (incurred but not recognized) charges, in order to obtain premium

increases from those programs to which WELLCARE would otherwise not have been entitled and would not have received.

108.   In July 2006, Vice President of Health Services/Operations Randy Zomerand, the head of WELLCARE'S Indiana region, complained that corporate completion factors were highly inflated.

109.   In July 2006, Vice President of Medical Economics Peter Clay said that CFO PAUL BEHRENS had instructed that IBNR charges were not to be analyzed or questioned.

110.   On July 10, 2006, Director of Florida Finance David Herndon told Relator that WELLCARE was making too much money in Florida and was using completion factors to hide WELLCARE'S true earnings.

111.   On August 17, 2006, Relator was informed that Director Jian Yu said she was not allowed to send documents relating to IBNR charges by email.  Ms. Yu also said that all calculations concerning the inflated IBNR rates were being done on paper and were being stored in her filing cabinet.

112.   Due to the false and inflated corporate completion factor documents made and used by Defendants WELLCARE and BEHRENS during WELLCARE's premium negotiations, the United States, the State of Florida, and the State of Indiana suffered damages and therefore are entitled to multiple damages under the Federal False Claims Act, the Florida False Claims Act, and the Indiana False Claims and Whistleblower Protection Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

113.    Based on WELLCARE'S conduct in Florida and Indiana, Relator believes that WELLCARE manipulated corporate completion factors on a company-wise basis.

## COUNT VIII:
### Reverse False Claims in Violation of 31 U.S.C. § 3729(a)(7) and Florida Statute § 68.082(2)(g)

114.    Relator realleges and incorporates by reference paragraphs 1 through 29.

115.    As of August 2006, Defendant WELLCARE was receiving overpayments totaling $2 million per year from the Florida Medicaid program as the result of mistakes made in premium coding which did not match the contractually agreed upon rate.

116.    On August 14, 2006, Relator attended a meeting at which Director of Florida Finance David Herndon said that Florida Medicaid was overpaying WELLCARE $2 million annually because of a mistake in premium coding.

117.    Although WELLCARE knew of these overpayments, it knowingly made and used false records and statements to conceal, avoid and decrease WELLCARE'S contractual obligation to pay or transmit overpayments to the Florida Medicaid Program.

118.    Due to Defendant WELLCARE'S actions, the United States and the State of Florida suffered damages and therefore are entitled to multiple damages under the Federal False Claims Act and the Florida False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

119.    Based on WELLCARE'S conduct, Relator believes that WELLCARE concealed overpayments made due to premium coding mistakes on a company-wide basis.

## COUNT IX:
### False Claims and Reverse False Claims in Violation of 31 U.S.C. §§ 3729(a)(1) and (a)(7); and New York State False Claims Act, Finance Law § 189(1)(a), (1)(b) and (1)(g)

120.    Relator realleges and incorporates by reference paragraphs 1 through 29.

121.    As of January 2006, Defendant WELLCARE had over billed the New York Medicaid program by $3 million in premiums because WELLCARE's data submissions to New York State falsely overstated the number of members in its Family HealthPlus program.

122.    On August 14, 2006, Financial Analyst Greg West told Relator that CFO PAUL BEHRENS had said in a morning meeting that WELLCARE over billed New York $3 million in premiums because WELLCARE'S date submissions to New York had falsely inflated its Family HealthPlus membership.

123.    Although WELLCARE knew of these overpayments, it knowingly made and used false records and statements to conceal, avoid and decrease WELLCARE'S contractual obligation to pay or transmit overpayments to the New York Medicaid Program.

124.    Due to the actions of Defendants WELLCARE and BEHRENS, the United States and the State of New York suffered damages and therefore are entitled to multiple damages under the Federal False Claims Act and the New York State False Claims Act to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

125.   Based on WELLCARE'S conduct in New York, Relater believes that WELLCARE concealed overpayments made due to overstated membership on a company-wide basis.

### COUNT X:
### Reverse False Claims in Violation of 31 U.S.C. § 3729(a)(7), Florida Statute § 68.082(2)(g) and Illinois Compiled Statutes Chapter 740, Article 175 et seq.

126.   Relator realleges and incorporates by reference paragraphs 1 through 29.

127.   Defendant WELLCARE was required by its contracts with the Florida Medicaid program and the Illinois Medicaid program to refund money to those programs through payback refunds and/or through an off-setting deduction from future premium payments if WELLCARE spent less than a specified percentage of the capitation paid by those programs for health care services to those programs' members.

128.   In 2006 and continuing thereafter, Defendant WELLCARE fraudulently increased the cost per member per month for over the counter pharmacy benefits from approximately $0.11 per month to approximately $5.00 per month in connection with the Illinois Medicaid program.

129.   By fraudulently appearing to increase its costs for over the counter pharmacy benefits, WELLCARE knowingly made or used a false record or statement to conceal, avoid and decrease its contractual obligation to repay and transmit money to the Government, and to the States of Florida and Illinois, through the Florida Medicaid Program, the Florida Healthy Kids Program, and the Illinois Medicaid Program.

130.   Due to Defendant WELLCARE'S actions, the United States, the State of Florida, and the State of Illinois, suffered damages and therefore are entitled to multiple

damages under the Federal False Claims Act, the Florida False Claims Act, and the Illinois Whistleblower Reward and Protection Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

131.     Based on WELLCARE'S conduct in Florida and Illinois, Relator believes WELLCARE fraudulently inflated benefit costs on a company-wide basis.

## INTRODUCTION TO COUNTS XI THROUGH XIV

132.     Individuals entitled to Medicaid health benefits in Florida may choose either the standard fee-for-service Medicaid program, or a managed care plan arranged by a managed care organization ("MCO") such as WELLCARE.

133.     Medicaid pays MCOs predetermined amounts ("capitations") for each enrolled member based on age/gender/eligibility/region categories and actuarial studies of the covered population groups.   The MCO in return arranges for enrolled member-beneficiaries to receive medical services by contracting with a network of medical services providers who are paid by the MCO.

134.     The relationship between payments to providers of medical services versus statistically determined capitations per age/gender/eligibility/region category paid by Medicaid is known as the medical loss ratio of a health maintenance organization. The lower the medical loss ratio the higher the profits.

135.     WELLCARE entered into a contract with Florida Medicaid to provide health services to Medicaid beneficiaries who enroll in WELLCARE'S plans. WellCare's Florida Medicaid contract was approved by the Health Care Financing Administration under the U.S. Department of Health and Human Services.

136.   After entering into its Florida Medicaid contract, and continuing thereafter until and including the date of this Complaint, WELLCARE would and did undertake fraudulent marketing practices and activities, sometimes referred to as "cherry picking," aimed at reducing or eliminating from its enrollment those members whose health care costs are likely to be higher than the averages determined by actuarial and statistical age/gender/eligibility/region studies upon which Medicaid bases its capitation rates.

137.   By engaging in "cherry picking," WELLCARE systematically disenrolls the least healthy individuals in order to extract higher profits from the Government, because its payments to medical providers are lowered while the statistically determined and fixed capitations, that Medicaid bases on "all comers" within the covered areas, remain high.

138.   As a condition of receiving payment under its Medicaid managed care contract WELLCARE is required by federal regulations, and its contract, to make certain quarterly certifications of data and information.  42 C.F.R. Secs. 438.602.

139.   Among the data that must be certified quarterly are all "enrollment information, encounter data, and other information required by the State and contained in contracts, proposals and related documents." 42 C.F.R. Sec. 438.604.

140.   42 C.F.R. Sec. 438.606 (b) provides in part that certifications  "must attest, based on the best knowledge, information, and belief, as follows: (1) To the accuracy, completeness and truthfulness of data...."

141.   Relator was employed as a Senior Financial Analyst in WELLCARE'S Health Services Area from 2002 to 2005, which is made up of the following departments:

Appeals and Grievances, Credentialing, Quality Improvement, Pharmacy, Inpatient Services, Outpatient Services, Behavioral Health Services and Special Populations.

142.    Each of the above departments is required to, and does, submit annual targets and initiatives related to its core function and designed to capitalize on profitable opportunities for WELLCARE within each identifiable population of members.  Teams within each department are responsible for hitting their targets.

143.    WELLCARE employs statistical analysts who are directed to identify high cost groups within WELLCARE'S membership that can be targeted for "cherry picking" practices, such as diversion or disenrollment.

144.    Relator was the primary analyst for the Health Services department between November 2002 and February 2005.  Relator attended monthly Health Services meetings with TODD FARHA (CEO), Jeff Potter (V.P. of Corporate Development), Dave Smith (V.P. of Medical Economics), Randy Zomermand (V.P. of Health Services), Ace Hodgin (Chief Operating Officer), Dr. Vincent Kunz (Chief Medical Officer of the Health Services Area), Lamar Register (Manager of Medical Economics), and others during which "cost containment initiatives" were discussed in detail.  During monthly meetings held in 2003 through 2005, Randy Zomermand presented Todd Farha and other members of senior management with PowerPoint presentations detailing improper cost-containment initiatives and Excel reports summarizing the expected and actual cost savings associated with improperly disenrolled members, including neonatal babies and terminally-ill patients.

145.    In 2003, Relator was instructed by Randy Zomermand to conduct studies with Dave Smith and Lamar Register to validate current and potential savings per

member disenrollment for various membership groups including, neonatal babies and terminally-ill patients. The study results indicated the potential for significant cost savings if a program was developed to identify and attempt to disenroll high-cost neonatal babies and terminally-ill patients. More specifically, the study findings identified an average savings of approximately $20,000 per disenrolled neonatal baby and $11,500 per disenrolled terminally-ill patient. The study findings were presented to Randy Zomermand and Dave Smith who then strategized and developed an initiative to create distinct teams to focus on disenrolling members in these high cost areas. Randy Zomermand selected Health Services Manager Beth Becker to manage the neonatal babies disenrollment team and Health Services Manager Judy Conley to manage the hospice disenrollment team.

146.   For 2004, Randy Zomermand and Dave Smith established a disenrollment target of 425 neonatal babies anticipated to result in a cost savings of $6.9 million ("CMS Conversion Plan"). **Exhibit 7**. In order to accomplish this goal, Beth Becker's neonatal babies team contacted the parents of neo-natal babies and persuaded them to elect to disenroll from WellCare's plan and instead enroll in ("convert into") the CMS program. The neonatal babies team tracked disenrollment progress on a member level basis by creating reports which included, among other items, member name, date the "case" was received by the disenrollment team, nurse assigned to the disenrollment effort, disenrollment date, and the estimated cost savings of disenrollment. Beth Becker provided these detailed reports to Relator on a regular basis and Relator summarized the information for inclusion in the Health Services reports presented at the monthly meetings to Todd Farha and other senior management.

34

147.    The neonatal babies disenrollment team succeeded in disenrolling 425 babies and "saving" millions of dollars.  As a reward, WellCare paid for a celebratory dinner for the entire neonatal babies disenrollment team.  Additionally, Beth Becker was recognized by WellCare as one of Health Services top employees in 2004 and was given a significant promotion.

148.    Similar to the neonatal disenrollment tracking reports described above, **Exhibit 8** is a document created by Judy Conley on June 7, 2004.  The document was used to track the outcome of terminally-ill members selected for disenrollment.  The report tracks, among other items, the date the team received the case, the member's response, and the estimated cost savings if the member was successfully disenrolled.  Additionally, **Exhibit 9** includes the "Hospice Conversion Plan" which details the conversion initiative concerning terminally-ill patients and evidences anticipated annual cost savings of $3 million.

149.    **Exhibit 10** is a document containing the major metrics discussed during the monthly Health Services meeting with Todd Farha.  One of the metrics closely tracked was NICU (neonatal intensive care unit) days per 1000 members. This was a critical high cost metric for Florida Medicaid accounting for approximately $20 million in annual expense until February of 2005 when neonatal babies stopped being assigned to WellCare.

150.    On November 13, 2006, Relator had a luncheon meeting with Dr. Vince P. Kunz, Medical Officer of WellCare's Health Services Area.  Because one of Dr. Kunz's primary duties is "utilization management," he is particularly interested in the above-described initiatives and targets aimed at cost cutting.  During the luncheon, Dr. Kunz

said that although WellCare would continue to "dump members," WellCare had to be more careful in light of a recent Chicago case involving Amerigroup Corporation. Additionally, Dr. Kunz also stated that "we [WellCare] would prefer them [members] to die because it's cheaper [for WellCare]."

151.    In 2003, WellCare's Medical Economics team (Dave Smith, Lamar Register, Michael Hylton, Relator, and others), along with Jeff Potter and Jack Shoemacker, analyzed Medicaid populations and determined that mothers and babies that needed assistance (known as Temporary Assistance for Needy Families (TANF) members) were highly unprofitable for WellCare (i.e., 90% medical loss ratio (MLR)) while the sick, blind, and disabled members (Supplemental Security Income (SSI) members) were highly profitable (i.e., <70% MLR).

152.    Jeff Potter, WellCare's Vice President of Corporate Development, told Relator that because of this situation, WellCare was going to implement a plan to aggressively grow SSI membership while concurrently reducing TANF membership in order to maximize profits for the company.  Thereafter, WellCare set out to accomplish this goal by (1) providing incentives to its sales representatives to recruit SSI members and (2) purposely designing benefit packages that would discourage TANF members from joining WellCare's plans.

153.    This strategy succeeded.  For example, WellCare was able to change its membership mix from 85.8% TANF & 14.2% SSI in September 2005 to 83.0% TANF & 17.0% SSI in December 2007.  In other words, WellCare's TANF membership decreased 3.2% and its SSI membership increased 19.6% over this period.  In comparison, all other

HMOs-combined only decreased TANF membership an approximate average of 1.8% and increased SSI membership an approximate average of 9.5% during this same period.

154.   WELLCARE committed fraud, submitted false data, and made and caused to be made false records and statements in order to get approval and payment by the Government of false and fraudulent claims, as set forth below:

(a) by discriminating among Medicaid-eligible enrollees on the basis of such enrollees' health status or need for health services;

(b) by terminating or denying benefits to eligible enrollees because of adverse changes in their health status or cost of medical care;

(c) by engaging in marketing designed and intended to discourage eligible enrollees from participating in its health plan based on their health status, their need for health services and the cost of their medical care;

(d) by marketing in a manner designed to discriminate among enrollees and not reach a fair distribution of eligible enrollees across age/gender/eligibility/region categories in the contracting area; and

(e) by submitting false, misleading and incomplete data certifications that failed to reflect the fraudulent and discriminatory marketing and enrollment practices described herein.

155.   By submitting false and misleading certifications, without which payments would not have been made, WELLCARE and FARHA knowingly made and caused to be made a false record or statement in order to get false and fraudulent claims paid by the Government.

156.   Based on WELLCARE's conduct in Florida, Relator believes WELLCARE engaged in discriminatory enrollment and disenrollment practices and improper denial of services on a company-wide basis.

## COUNT XI:
### Federal False Claims Act – Presentation of False Claims
### (31 U.S.C. § 3729(a)(1)

157.   Relator realleges and incorporates by reference paragraphs 1 through 29 and 132 through 156.

158.   Defendants WELLCARE and FARHA knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the United States.

159.   By virtue of the false and fraudulent claims made by Defendants WELLCARE and FARHA, the United States suffered damages and therefore is entitled to multiple damages under the Federal False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## COUNT XII:
### Federal False Claims Act – Making or Using a False Record or Statement
### (31 U.S.C. § 3729(a)(2)

160.   Relator realleges and incorporates be reference paragraphs 1 through 29 and 132 through 156.

161.   Defendants WELLCARE and FARHA knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States.

162.   By virtue of the false and fraudulent claims made by Defendants WELLCARE and FARHA, the United States suffered damages and therefore is entitled

to multiple damages under the Federal False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

**COUNT XIII:**
**Florida False Claims Act – Presentation of False Claims**
**Florida Statute § 68.082(2)(a)**

163.    Relator realleges and incorporates by reference paragraphs 1 through 29 and 132 through 156.

164.    Defendants WELLCARE and FARHA knowingly presented or caused to be presented false and fraudulent claims for payment or approval to the State of Florida.

165.    By virtue of the false and fraudulent claims made by Defendants WELLCARE and FARHA, the State of Florida suffered damages and therefore is entitled to multiple damages under the Florida False Claims Act, to be determined at trial, plus a civil penalty of $5,000 to $10,000 for each violation.

**COUNT XIV:**
**Florida False Claims Act – Making or Using a False Record or Statement**
**Florida Statute § 68.082(2)(b)**

166.    Relator realleges and incorporates by reference paragraphs 1 through 29 and 132 through 156.

167.    Defendants WELLCARE and FARHA knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Florida.

168.    By virtue of the false and fraudulent claims made by Defendants WELLCARE and FARHA, the State of Florida suffered damages and therefore is entitled to multiple damages under the Florida False Claims Act, to be determined at trial, plus a civil penalty of $5,000 to $10,000 for each violation.

## COUNT XV:
### Reverse False Claims in Violation of 31 U.S.C. § 3729(a)(7) and Florida Statute § 68.082(2)(g)

169.    Relator realleges and incorporates by reference paragraphs 1 through 29.

170.    In August 2006, Defendant WELLCARE was informed by the Florida Medicaid program that it had erroneously been overpaid $25 million in premiums for Medicaid beneficiaries who were also eligible for the Medicare program ("dual eligible beneficiaries").

171.    In October or November 2006, the Florida Medicaid program reduced its overpayment demand regarding dual eligible beneficiaries to $3 million based on an erroneous file feed of WELLCARE members.

172.    Realizing that the underlying file feed of members was erroneous and that the true overpayment was much higher than $3 million, Defendant WELLCARE quickly repaid the $3 million amount as if that were the true overpayment amount, while concealing, avoiding and decreasing its contractual obligation to repay the rest of the money it was overpaid.

173.    Vice President of Government Affairs Marc Ryan said "This amount is equal to the amount paid by Amerigroup which has half as many duals as we do."

174.    In June 2007, Alphons Immanuel, Special Populations Business Analyst, was asked how WellCare was able to get paid for dual eligible beneficiaries that are not in WellCare's membership system.  Immanuel replied "Oh the member is in our system. It is just that they are not eligible during the month, but the premium still gets paid. Sometimes the Government takes back the money when they find out but sometimes they don't."

175.   Due to Defendant WELLCARE's actions, the State of Florida suffered damages and therefore is entitled to multiple damages under the Florida False Claims Act, to be determined at trial, plus a civil penalty of $5,000 to $10,000 for each violation.

176.   Based on WELLCARE'S conduct in Florida, Relator believes WELLCARE concealed overpayments due to data errors on a company-wide basis.

## COUNT XVI
### Reverse False Claims in Violation of 31 U.S.C. § 3729(a)(7) and Florida Statute § 68.082(2)(g)

177.   Relator realleges and incorporates by reference paragraphs 1 through 29.

178.   In and prior to August 2006 and continuing thereafter, defendants AMERIGROUP and VALUEOPTIONS utilized similar strategies to WELLCARE'S tactics described in this complaint in order to improperly retain overpaid premiums and avoid contractual refund obligations to Florida Medicaid, and collectively reduce a regulatory agency's ability to detect the companies' improper actions.

179.   AMERIGROUP and VALUEOPTIONS, like WELLCARE, knowingly made and used false records or statements to conceal, avoid and decrease their obligations to repay erroneous Medicaid overpayments.

180.   Some of the cooperation between WellCare and Amerigroup involves coordination of their false claims and reverse false claims, so that both are consistent in false billing practices, minimizing the chances of detection by a Medicaid audit questioning discrepancies by each company in claimed costs for the same services.

181.   The foregoing was reported to Relator by Bill Kale, M.D., Vice President of Harmony Behavioral Health, on August 10, 2006 and later supported by Kerri Fritsch, Senior Director of Finance for Harmony Behavioral Health and a former employee of

41

Amerigroup.  In addition, Financial Analyst Greg West informed Relator that, like WellCare, Amerigroup had received large sums from Florida Medicaid which represented inadvertent overpayments, and that Amerigroup intentionally retained and continues to retain such overpayments without notification to Medicaid.

182.    Around March 29, 2007, Relator had a conversation with Kerri Fritsch and Greg West in which Greg West discussed the "illegal scenarios, the more illegal the better" for underreporting WellCare's true payback obligation to the State of Florida for 2006 which West had discussed with TODD FARHA and PAUL BEHRENS.  During that conversation, Kerri Fritsch stated that she had been responsible for providing scenarios for underreporting Amerigroup's true payback obligation to the State of Florida when she had worked at Amerigroup prior to being hired by WellCare.  Ms. Fritsch said "I know how difficult this process can be and how difficult it can be to keep all the accounting straight, because I had to do the same thing back at Amerigroup."

183.    On April 17, 2007, Provider Relations Manager Russell Morgan explained how VALUEOPTIONS defrauded Florida Medicaid through a capitated arrangement like HARMONY and through pricing claims at up to three times the Medicaid rate in order to avoid a payback obligation.

184.    In approximately May 2007, Relator was present when Dr. Kale offered a file to Kerri Fritsch containing codes shifted by Amerigroup to avoid refunds or paybacks.  Ms. Fritsch refused Dr. Kale's offer due to her concerns about legal liability. Relator recorded and gave notes regarding this exchange to the investigating agents.  *See* **Exhibit 11**.    This information evidences other defendants' (described in Count XVI)

42

utilization of tactics, similar to WellCare's tactics, to improperly avoid refund obligations.

185. In September 2007, Relator had a meeting with Kerri Fritsch and Greg West. During that meeting, Kerri Fritsch stated that she had persuaded the CEO of Amerigroup to use inflated costs for the 80/20 behavioral health payback calculations Ms. Fritsch said the CEO of Amerigroup asked initially "Why don't we just submit the actual costs?" and Ms. Fritsch explained to the CEO "if we did that it would cost Amerigroup millions."

186. In addition, WellCare's fraudulent schemes outlined in Counts VI and IXX also involved AMERIGROUP and VALUEOPTIONS because the overpayments for infants described in Count VI and the systemic programming error concerning age groupings described in Count IXX affected all Florida Medicaid HMOs working with AHCA.

187. Due to the actions of Defendants WELLCARE, AMERIGROUP and VALUEOPTIONS, the United States and the State of Florida suffered damages and therefore are entitled to multiple damages under the Federal False Claims Act and the Florida False Claims Act, to be determined at trial, plus applicable civil penalties for each violation.

**COUNT XVII**
**Reverse False Claims in Violation of 31 U.S.C. § 3729(a)(7)**
**and Florida Statute § 68.082(2)(g)**

188. Relator realleges and incorporates by reference paragraphs 1 through 29.

189. In July 2005, AHCA granted a significant premium increase to WELLCARE, AMERIGROUP, and other HMOs and VALUEOPTIONS and other

prepaid mental health plan providers for the Medicaid behavioral health carve out as a result of companies inflating their actual expenses for behavioral health services.

190.    In April 2006, Financial Analyst Greg West prepared a data feed of encounter data for behavioral health services provided for the two year period between July 2003 and June 2005.  Institutional encounters consisted of one WellCare generated procedure line which captured the total cost of the claim as well as the actual individual procedures of the claim with no pricing.

191.    Following WellCare's submission of this data feed, AHCA contracted with an actuarial firm named Milliman Consultants and Actuaries ("Milliman") to review WellCare's data feed.  Milliman erroneously priced the individual procedure lines in addition to capturing the entire cost of the claim already accounted for on the WellCare generated procedure line. Milliman overpriced WellCare's behavioral health institutional costs by $9.2 million for 2003 and by $10.2 million for 2004.

192.    This data feed was sent by WellCare to AHCA to be used for the behavioral health outpatient premium rate changes starting July 2006.  In July 2006, AHCA granted WellCare another premium increase for behavioral health outpatient services.

193.    In September 2006, Defendant WELLCARE realized that the Agency for Health Care Administration ("AHCA") had erroneously overpriced WELLCARE's behavioral health institutional costs by $9.2 million for 2003 and by $10.2 million for 2004 and that AHCA had relied on those erroneously overpriced costs in granting WELLCARE a premium increase for behavioral health outpatient services in July 2006.

194.   Despite this knowledge, WELLCARE failed to notify AHCA and knowingly retained and failed to return the inflated premiums it received following the July 2006 premium increase for behavioral health outpatient services.

195.   WELLCARE thereby concealed, decreased and avoided its contractual obligation to repay and transmit to the Government and the State of Florida premium amounts which WELLCARE knew were based upon AHCA's mistaken pricing of WELLCARE's behavioral health institutional costs for 2003 and 2004.

196.   On September 13, 2006, AHCA sent WellCare an encounter file which caused Financial Analyst Greg West to realize that Milliman, as discussed above, had erroneously priced component line items which had already been included in the total price for each encounter line.   West then sent an email to Robert Butler, Director of Medicaid Policy and Analytics, on September 15, 2006, attached as **Exhibit 12**, advising Butler that Milliman's error had "cause[d] WellCare's institutional claims to be over priced."   In spite of this knowledge, however, WellCare never advised AHCA of Milliman's error and never refunded the money which WellCare had been overpaid due to Milliman's error.

197.   Due to Defendant WELLCARE's actions, the United States and the State of Florida suffered damages and therefore are entitled to multiple damages under the Federal False Claims Act and the Florida False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

198.   Based on WELLCARE'S conduct in Florida, Relator believes WELLCARE made false and fraudulent data submissions on a company-wide basis to

support improper refund or pay back amounts and to provide the basis for inflated premium rate increases.

## COUNT XVIII
### False Claims and Reverse False Claims in Violation of 31 U.S.C. § 3729(a)(1) and (a)(7) and Florida Statute § 68.082(2)(a) and(2)(g)

199. Relator realleges and incorporates by reference paragraphs 1 through 29.

200. On December 29, 2006 and January 2, 2007, Melanie Brown-Woofter, the Acting Bureau Chief of AHCA's Health Systems Development unit, requested by letter that WellCare submit certified Medicaid behavioral health encounter data for Areas 1 and 6. The encounter data was initially required to be submitted by January 31, 2007, but t WellCare's request, AHCA later agreed to extend the deadline to February 9, 2007.

201. On January 2, 2007, AHCA official Ralph Quinn and Robert Butler, Wellcare's Director of Medicaid Policy and Analytics, exchanged emails confirming that AHCA required encounter data for the period between July 1, 2005 and June 30, 2006. Robert Butler also requested, and Ralph Quinn agreed, that WellCare could submit additional encounter data for the period between July 1, 2004 and June 30, 2005 for AHCA's consideration in setting future premium rates.

202. On that same day, Robert Butler sent an internal WellCare email confirming that Ralph Quinn and ACHA wanted actual encounter pricing in order to see WellCare's actual costs for providing services.

203. WellCare management decided not to submit accurately priced encounter data for Areas 1 and 6 to AHCA. Instead, WellCare fraudulently inflated the cost of each procedure by between 218 percent and 299 percent of the actual cost. CFO PAUL

BEHRENS characterized WellCare's response to AHCA this way: "Yeah, I know, a donut cost a dollar, and we're just saying it cost $2, I get it."

204.    In addition, Relator was instructed by Robert Butler to meet with Financial Analyst Greg West and use the "same duplication method" used in the previous year's submission in an attempt to capitalize on the same type of Milliman error described in Section G.1. herein and Count XVII of the Complaint. At a meeting which included Vice President of Medical Economics Peter Clay, Relator was instructed to include a WellCare generated procedure code capturing the entire cost of the claim in addition to the actual individual procedures with no pricing with the expectation that AHCA would once again duplicate each claim.   Peter Clay said "It's highly illegal, but I haven't heard any of you come up with an idea that's better than mine."   After that meeting, Peter Clay asked Relator "Why did you invite so many people to that meeting? You have to be careful, this is fraud."

205.    On or about February 9, 2007, WellCare submitted this fraudulently inflated behavioral health encounter data for the period July 1, 2004 through June 30, 2006 from WellCare of Florida, Inc. and HealthEase of Florida, Inc. under a cover letter signed by MT Sattaur, President of WellCare of Florida, which certified that "[t]o the best of my knowledge, information and belief as described herein, the information submitted is accurate, complete and truthful."   The fraudulently inflated encounter data submitted consisted of 161,170 claims.

206.    **Composite Exhibit 13** contains a chronology with supporting documentation evidencing and detailing the chain of events in connection with WellCare's improper Areas 1 and 6 encounter data submittal.

207.   On February 21, 2007, Melanie Brown-Woofter requested that WellCare submit behavioral health encounter data for Medicaid Areas 5 and 7 for the period July 1, 2005 through June 30, 2006 by March 5, 2007 to AHCA. Ms. Brown-Woofter stated that this "request for data for Areas 5 and 7 was inadvertently omitted with the previous request for data for Areas 1 and 6." At WellCare's request, the deadline was executed to March 9, 2007 by AHCA.

208.   On February 22, 2007, Robert Butler sent an internal WellCare email to Greg West, Kerri Fritsch, Senior Director of Harmony Behavioral Health, and the Relator discussing how and whether to price the Areas 5 and 7 encounter data. Even though Mr. Butler knew that Ralph Quinn, on January 2, 2007, specifically requested and required pricing in connection with the Areas 1 and 6 submittal, Mr. Butler suggested pricing should not be included in the Areas 5 and 7 submittal. On that same day, Kerri Fritsch instructed Relator to prepare three different scenarios for pricing the encounters in order to analyze and determine whether to submit the encounter data with pricing or without pricing. The three methods of pricing the requested Area 5 and 7 encounter data included: (1) the actual capitation paid to Harmony Behavioral Health spread over the encounters for the period; (2) the actual fee for service cost that Harmony Behavioral Health paid to the providers; and (3) the encounters priced at Medicaid fee schedule rates.

209.   On February 27, 2007, Kerri Fritsch discussed the Areas 5 and 7 encounter data submittal obligation and the three different pricing scenarios with Vice President of Accounting Bill White and CFO PAUL BEHRENS at a P&L meeting. During that meeting, PAUL BEHRENS said "Send AHCA the encounter data without pricing and wait and see if AHCA responds. If AHCA demands pricing, then we will determine

which pricing scenario to use." WellCare decided not to submit any pricing for these encounters in order to avoid AHCA lowering WellCare's premium rates and decided instead to strip fee for service payments made from the encounter data submitted to AHCA. Rather than submitting accurately priced encounter data to AHCA, WELLCARE submitted encounter data in which fee for service prices paid were stripped from such encounters and the individual lines supporting the summary line for each procedure were set to zero in anticipation that AHCA's actuary service would, as it did the prior year, erroneously duplicate price the individual procedure lines.

210.    On March 1, 2007, Robert Butler sent an internal WellCare email summarizing the Areas 5 and 7 encounter data request and discussing why pricing was not to be included in the submittal to AHCA, including that even though the data "submitted for Areas 1 and 6 was priced based upon what EAS/WCG [allegedly] paid to HBH," he recommended submitting the Areas 5 and 7 encounter data without pricing because "using that methodology results in a depressed PMPM." This email also attached and forwarded a draft submittal letter to AHCA which strategically included the language stating that "[a]s the pricing of the encounters was optional per the data request, no payment information has been included due to system issues and the limited time frame provided for submission" and a certification that the information submitted was "accurate, complete and truthful."

211.    However, such representations were false and fraudulent because: (1) WellCare knew the Areas 5 and 7 data request was inadvertently omitted by AHCA when it requested the Areas 1 and 6 data; (2) WellCare knew Ralph Quinn had previously specifically requested pricing for Areas 1 and 6; (3) WellCare submitted pricing (albeit

falsified) for Areas 1 and 6; and (4) pricing was not omitted for Areas 5 and 7 because of "system issues" or "limited time frame." WellCare did not have "system issues" and it had more than sufficient time to thoroughly analyze various pricing scenarios. Rather, WellCare strategically chose not to include pricing in order (1) to prevent AHCA from learning about WellCare's true costs for Medicaid behavioral health services so that WellCare would not be required to refund some of the premiums it had received in 2006 and (2) to help ensure that WellCare would receive further premium increases in July 2007 and thereafter.

212.   On or about March 2, 2007, Robert Butler requested, and subsequently received, an extension to March 9, 2007 for the Areas 5 and 7 encounter data submittal. On or about March 6, 2007, WellCare of Florida President MT Sattaur executed the final forwarding letter containing the false and fraudulent certifications described above. Thereafter, per Robert Butler's instruction, the forwarding letter and final encounter data file without pricing was submitted to AHCA.

213.   **Composite Exhibit 14** contains a chronology with supporting documentation evidencing and detailing the chain of events in connection with WellCare's improper Areas 5 and 7 encounter data submittal.

214.   THADDEUS BEREDAY approved WellCare's improper encounter data submitted for Areas 1 and 6 and for Areas 5 and 7.

215.   In March 2007, Senior Director of Medical Economics Jian Yu told Relator and Senior Director of Harmony Behavioral Health Kerri Fritsch "Each year we come up with a different method for avoiding payback. I'm going to create a standard method that we're going to use going forward to submit the payback."

216.   In an April 27, 2007 letter to WellCare, Milliman specifically requested that WellCare let "AHCA and Milliman know if there are any other data issues that suppress the encounters or if you have any other reasons to believe this data is either inaccurate or incomplete" and that WellCare should thoroughly review Milliman's summaries and "inform AHCA and Milliman of any defects or inconsistencies with [WellCare's] reporting."   However, WellCare never disclosed that its Areas 1 and 6 encounter pricing had been falsified and that its Areas 5 and 7 encounter pricing had intentionally been omitted to mislead AHCA.

217.   **Composite Exhibit 15** contains a chronology with supporting documentation evidencing and detailing the chain of events in connection with AHCA's rate-setting consultant's (Milliman) analysis and utilization of WellCare's improper Areas 1, 5, 6, and 7 encounter data submittals used to help AHCA develop and certify its September 1, 2007 – August 31, 2008 capitation rates.

218.   On April 17, 2007, Hazel Greenberg, the Program Administrator of AHCA's Medicaid Program Compliance office within the Bureau of Managed Health Care, specifically requested that HealthEase and StayWell of Florida submit "the encounter data, with codes and reimbursement amounts for each code, for documentation for the 2006 Community Mental Health and Targeted Case Management Expenses." On that same day, Robert Butler sent an internal email acknowledging that "[w]e may need to discuss as this [request] appears to present certain challenges. Please advise how you recommend we proceed." CFO PAUL BEHRENS responded to the email and identified that he and Jian Yu would become responsible for providing the requested information.

219.    Despite AHCA's specific pricing request, Paul Behrens and Vice President of Government Affairs Marc Ryan decided to submit the encounter data without pricing. From May 9, 2007 through May 20, 2007, Greg West worked with Jian Yu, Marc Ryan, and PAUL BEHRENS to prepare the non-priced encounter data. On May 21, 2007, Greg West submitted to AHCA, after PAUL BEHRENS' and Marc Ryan's review, the data for 390,135 encounters without pricing data and with fee for service payments made to providers "set to blank." Approximately 2/3 to 3/4 of all encounters had such payment data which was not provided to AHCA.

220.    WELLCARE did this (1) to prevent AHCA from learning about WELLCARE's true costs for Medicaid behavioral health services so that WELLCARE would not be required to pay back some of the premiums it had received in 2006; and (2) to help ensure that WELLCARE would receive another premium increase in July 2007.

221.    On June 22, 2007, David Starn of AHCA sent an email to Dr. Bill Kale, Vice President of Harmony Behavioral Health, regarding deficiencies in the encounter data submittal and stated "[m]ost importantly, there is no Amount Paid for any of the other encounters reported." Mr. Starn required that WellCare "re-submit the reports" to AHCA by June 26, 2007 "with correct data."

222.    On June 26, 2007, Greg West told Relator that PAUL BEHRENS and Kerri Fritsch instructed Mr. West to falsely re-price the encounter data in order to submit priced encounter data to AHCA which could support WellCare's 2006 refund amount. On that same day, Mr. West emailed the file containing the re-priced encounter data to PAUL BEHRENS, Jian Yu, and Kerri Fritsch. Thereafter, the falsely priced encounter data was submitted to AHCA.

223.   **Composite Exhibit 16** contains a chronology with supporting documentation evidencing and detailing the chain of events in connection with WellCare's improper encounter data submittal concerning WellCare's 2006 Community Mental Health and Targeted Case Management expenses.

224.   WELLCARE and BEHRENS thereby made and used false records to conceal, avoid and decrease its obligation to repay and transmit to the Government and the State of Florida premium amounts which WELLCARE and BEHRENS knew should have been paid back to AHCA pursuant to the contractual and statutory pay back requirement, and made or used false records to get false claims in the form of increased premiums paid or approved.

225.   Due to the actions of WELLCARE and BEHRENS, the United States and the State of Florida suffered damages and therefore are entitled to multiple damages under the Federal False Claims Act and the Florida False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

226.   Based on WELLCARE'S conduct in Florida, Relator believes WELLCARE made false and fraudulent data submissions on a company-wide basis to support improper refund or payback amounts and to provide the basis for inflated premium rate increases.

**COUNT IXX**
**False Claims and Reverse False Claims in Violation of 31 U.S.C. § 3729(a)(1)**
**and (a)(7) and Florida Statute § 68.082(2)(a) and (2)(g)**

227.   Relator realleges and incorporates by reference paragraphs 1 through 29.

228.   Beginning in mid-2005, the Florida Medicaid program began erroneously

overpaying WELLCARE $250,000 to $500,000 per month due to a systemic programming error concerning age groupings.

229.   After approaching Director Jian Yu in order to understand the circumstances surrounding the erroneous overpayment, Relator was directed by Ms. Yu to follow-up with Senior Actuary Sarah Duyof in order to obtain the details of the overpayment.  Ms. Duyof carefully explained to Relator her analysis of the variance between the contract specifications and the actual payments WellCare received from ACHA.

230.   By 2006, top WellCare officials were aware of these overpayments. Director of Florida Finance David Herndon and Jim Beerman, Vice President of Florida Finance, told Relator that they had discussed these overpayments with Vice President of Medical Economics Peter Clay in order to find out whether WellCare would set aside these amounts in its internal accounting of income.  WellCare (through CFO PAUL BEHRENS and Peter Clay) decided to continue to include these overpayments in its internal income accounting and deliberately chose not to refund these overpayments.

231.   A mid-range monthly overpayment of $375,000 for the two and a half years since mid-2005 yields an estimated overpayment of $11,250,000 for WellCare.

232.   By 2006, top WELLCARE officials were aware of these overpayments. Despite this knowledge, WELLCARE and BEHRENS failed to notify AHCA and knowingly retained and failed to return these overpayments.

233.   Although WELLCARE and BEHRENS knew of these overpayments, they knowingly made and used false records and statements to conceal, avoid and decrease

WELLCARE's contractual obligation to pay or transmit money to the Florida Medicaid Program.

234.  Due to the actions of Defendants WELLCARE and BEHRENS, the United States and the State of Florida suffered damages and therefore are entitled to multiple damages under the Federal False Claims Act and the Florida False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

235.  Based on WELLCARE'S conduct in Florida, Relator believes WELLCARE concealed overpayments due to systemic programming errors on a company-wide basis.

**COUNT XX**
**False Claims Conspiracy in Violation of 31 U.S.C. §3729(a)(3)**
**and Florida Statute §68.082(2)(c)**

236.  Relator realleges and incorporates by reference paragraphs 1 through 29.

237.  Between at least 2004 through at least October 2007, TODD FARHA, PAUL BEHRENS, THADDEUS BEREDAY and other WELLCARE employees conspired to defraud the United States, the State of Florida and other states by getting false and fraudulent claims allowed or paid.

238.  In furtherance of this illegal agreement FARHA, BEHRENS and BEREDAY performed the following acts:

A.  FARHA directed WELLCARE employees to develop a plan to significantly reduce or avoid future Florida Medicaid repayment obligations for Targeted Case Management and Community Mental Health services.

B.      FARHA approved falsely reporting unrelated expenses as Targeted Case Management and Community Mental Health costs in order to reduce WELLCARE's payback obligations to Florida Medicaid.

C.      FARHA approved WELLCARE's fraudulent refund payment to Florida Medicaid in June 2006.

D.      BEHRENS approved WELLCARE's fraudulent refund payment to Florida Medicaid in April 2007.

E.      BEHRENS directed that WELLCARE's internal auditors stay clear of auditing HARMONY BEHAVIORAL HEALTH, INC., in April-May 2006.

F.      FARHA approved WELLCARE's contract with South Broward Hospital District in December 2005 knowing that this contract was designed to reduce WELLCARE's payback obligation to Florida Medicaid.

G.      FARHA approved WELLCARE's payment of inflated reinsurance to its wholly-owned Cayman Islands subsidiary.

H.      BEHRENS instructed that IBNR charges were not to be analyzed or questioned.

I.      BEHRENS directed that the $3 million of overpayments received from New York Medicaid be kept by WELLCARE and not refunded.

J.      FARHA approved WELLCARE's efforts to disenroll neonatal babies and terminally ill patients.

K.      FARHA, BEHRENS and BEREDAY approved WELLCARE's submissions of fraudulent encounter data to AHCA from Areas 1 and 6 and from Areas 5 and 7.

L.      BEHRENS directed that monthly overpayments made by the Florida Medicaid program beginning in mid 2005 due to a programming error concerning age groupings be kept by WELLCARE and not refunded.

239.    The United States and the State of Florida suffered damages from this conspiracy and are therefore entitled to multiple damages under the Federal False Claims Act, and the Florida False Claims Act, to be determined at trial.

Prayer for Relief

WHEREFORE, Relator respectfully request this Court enter judgment against Defendants and order:

(a)     That the United States, the States of Florida, Illinois, Indiana, Louisiana, New York, Georgia, and Hawaii, be awarded damages in the amount of three times the $400-$600 million single damages sustained because of the false and fraudulent claims alleged within this Complaint;

(b)     That the maximum civil penalties allowable be imposed for each and every false and fraudulent claim that Defendants presented to the United States, the States of Florida, Illinois, Indiana, Louisiana, New York, Georgia, and Hawaii;

(c)     That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which the Relator necessarily incurred in bringing and pressing this case;

(d)     That the Court grant permanent injunctive relief to prevent any recurrence of the False Claims Act violations for which redress is sought in this Complaint;

(e)     That the Relator be awarded the maximum amount allowed pursuant to the False Claims Act and the false claims statutes of the States of Florida, Illinois, Indiana, Louisiana, New York, Georgia, and Hawaii; and

(f)     That this Court award such other and further relief as it deems proper.

## Demand for Jury Trial

Relator, on behalf of himself, the United States, and the States of Florida, Illinois, Indiana, Louisiana, New York, Georgia, and Hawaii demands a jury trial on all claims alleged herein.

Respectfully submitted,

*/s/ Barry A. Cohen*
BARRY A. COHEN, ESQ.
Florida Bar No. 096478

*/s/ Kevin J. Darken*
KEVIN J. DARKEN, ESQ.
Florida Bar No. 0090956
COHEN, FOSTER & ROMINE, P.A.
201 E. Kennedy Blvd, Suite 1000
Tampa, FL 33602
Tel: (813) 225-1655
*Attorneys for Relator*

DANIEL N. GASTI, ESQ.
Florida Bar No. 0269440
Law Office of Daniel N. Gasti, P.A.
4326 New Broad Street, Unit 204
Orlando, FL 32814
(407) 415-9390
*Attorney for Relator*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing *Corrected Eighth Amended False Claims Act Complaint and Demand for Jury Trial* has been furnished via *CM/ECF* to Assistant United States Attorney Charles Harden, III, United States Attorney's Office, 400 N. Tampa Street, Suite 3200, Tampa, FL 33602; to the

States Attorney's Office, Attn: <u>Civil Process Clerk</u>, 400 North Tampa Street, Suite 3200,

Tampa, Florida 33602; <u>Allie Pang, Trial Attorney, United States Department of Justice,</u>

Civil Division, Commercial Litigation Branch, Civil Frauds Section, 601 D Street NW,

Room 9150, Washington, DC 20004; to <u>Lara J. Tibbals and Dennis Parker Waggoner,</u>

Hill Ward Henderson, P.A., 101 E. Kennedy Boulevard, Suite 3700, P.O. Box 2231,

Tampa, Florida 33601-2231, and <u>Mitchell S. Ettinger and Jennifer L. Spaziano</u>, Skadden,

Arps, Slate, Meagher & Flom, LLP, 1440 New York Avenue, N.W., Washington, D.C.

20005-2111, Attorneys for Amerigroup Florida Inc., and Amerigroup Corporation,

<u>Daniel Alter</u>, Gray Robinson, P.A., 401 E. Las Olas Boulevard, Suite 1850, Ft.

Lauderdale, Florida 33301, and <u>Mark T. Calloway and William H. Jordan</u>, Alston &

Bird, LLP, 101 South Tryon Street, Suite 4000, Charlotte, NC 28280-4000, Attorneys for

United Healthcare Group, Inc., United Health Care of Florida, Inc., and United

Healthcare Services, Inc., <u>Margaret D. Matthews</u>, Akerman Senterfitt, 401 E. Jackson

Street, Suite 1700, Tampa, Florida 33602, Attorney for Humana Medical Plan, Inc. d/b/a

Humana Family and <u>Robert W. Pass</u>, Calton Fields, P.A., 215 S. Monroe Street, Suite

500, Tallahassee, Florida 32301 and <u>Chris S. Coutroulis</u>, Carlton Fields, P.A., Corporate

Center III at International Plaza, 4221 West Boy Scout Boulevard, Tampa. Florida

33601-3239, Attorneys for Vista Healthplan, Inc., <u>Richard Oliver</u>, Buchanan Ingersoll &

Rooney, PC, 401 E. Jackson Street, Suite 2500, Tampa, Florida 33602, and <u>John F.</u>

<u>MacLennan</u>, Smith Hulsey & Busey, 225 Water Street, Suite 1800, Jacksonville, Florida

32202, Attorneys for ValueOptions, Inc., Florida Health Partners, Inc. and Florida

Behavioral Health, Inc., and by *Federal Express* to: <u>Attorney General Bill McCollum</u>,

Office of Attorney General, The Capitol, Tallahassee, Florida   32399-1750; <u>Chief</u>

Financial Officer Alex Sink, Department of Finance, 200 East Gaines Street, Tallahassee, Florida   32399-0300; Attorney General Lisa Madigan, 12th Floor, 100 West Randolph Street, Chicago, Illinois 60601; Legal Office, Illinois State Police, 124 East Adams Street, Room 102, P.O. Box 19461, Springfield, Illinois, 62794; Attorney General Steve Carter, 302/402 West Washington Street, IGCS-5[th] Floor, Indianapolis, Indiana, 46204; Inspector General David Thomas, 150 West Market Street, Room 414 ISTA, Indianapolis, Indiana   46204; Attorney General Charles C. Foti, Jr., P.O. Box 94005, Baton Rouge, Louisiana 70804; Attorney General Andrew M. Cuomo, 120 Broadway, New York, New York 10271-0332; Attorney General Thurbert E. Baker, 40 Capital Square, SW, Atlanta, Georgia 30334; and Attorney General Mark Bennett, 425 Queen Street, Honolulu, Hawaii, 96813, this __7th__ day of December, 2010.

*/s/ Kevin J. Darken*_____
Kevin J. Darken